**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:09-cr-81-W**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| TALVIN LEAK, ) | |
| Defendant. ) | |

## I. BACKGROUND

**THIS MATTER** is before the Court upon Defendant's Motion to Suppress (Doc. No. 12). The Court has also considered the Government's response to the Motion (Doc. No. 13), the arguments of counsel made at a hearing before the undersigned on January 5, 2010, other supplemental documents submitted by the parties (Doc. Nos. 14, 15, 16, 17, 18, 19, 21, 22), and has reviewed the video footage of Defendant's arrest.

Defendant was charged in a three count Bill of Indictment for unlawful possession a firearm in violation of Title 18 U.S.C. § 922(g)(1), possession with the intent to distribute cocaine in violation of Title 21 U.S.C. § 841, and use of a firearm in furtherance of a drug trafficking crime in violation of Title 18 § 924(c). Defendant seeks to suppress the 11.1 grams of crack cocaine that officers found during a search of the vehicle Defendant was driving following his arrest for driving with a suspended license and for carrying a concealed weapon. For the reasons set forth, Defendant's Motion is **DENIED.**

## II. FINDINGS OF FACT

Based on the evidence presented and the record, the Court makes the following findings of fact:

1. On October 28, 2008, Detective Henry Suhr, with the Charlotte-Mecklenburg Police Department, Vice Narcotics Division, and another Detective were on duty in plain clothes in an unmarked, undercover car investigating a drug complaint.

2. Detective Suhr had called Officer Dan Decker, a uniformed officer with the Charlotte-Mecklenburg Police Department, to request possible assistance that evening during the investigation.

3. Detective Suhr met an individual for the purpose of purchasing drugs. This individual got into the Detective's car and told him that he did not have any drugs, but that he could get them for Detective Suhr. Detective Suhr revealed to the individual that he was with the Charlotte-Mecklenburg Police Department, and the individual agreed to cooperate with Detective Suhr. The individual then became an anonymous informant.

4. This informant then contacted a second person by cell phone while Detective Suhr listened on speaker phone. The informant made arrangements to meet a dealer at a gas station located at the corner of Pence Road and Harris Boulevard. Detective Suhr learned that the dealer would be driving a black Cadillac.

5. A few minutes afterward, Detective Suhr observed a black Cadillac pass him and drive into the parking lot of the gas station.

6. Detective Suhr tried to verify that the driver of the black Cadillac was the person they were waiting for by having the informant call the dealer. At the request of Detective Suhr, the informant told the dealer to move locations because he had seen police in the area and instructed the dealer to meet him off Albermarle Road.

7. After this phone call, the black Cadillac then proceeded to leave the gas station and drove in the direction of Albermarle Road.

8. These phone calls are corroborated by Defendant's own testimony that he received a phone call from an individual wanting to buy drugs.

9. Detective Suhr began following the black Cadillac. During this time, Detective Suhr observed the black Cadillac run a stop sign at the intersection of Pence Road and Harrisburg Road.

10. Detective Suhr contacted Officer Decker and indicated that he had observed the black Cadillac run a stop sign and that there might be possibly something else in the vehicle. Though Officer Decker testified that he did not recall this particular statement, Detective Suhr testified that he told Officer Decker that if there were any problems, he had additional "PC," but try to reserve it for the confidentiality of the informant in his car.

11. Officer Decker's vehicle equipment was not working properly, so Officer Decker asked Officer Edward Hendricks, a uniformed officer with the Charlotte-Mecklenburg Police Department, to assist in making the stop. Officer Hendricks was able to make contact with Detective Suhr about his observation of the black Cadillac running the stop sign before initiating the stop.

12. Officer Hendricks then initiated a traffic stop of the black Cadillac displaying North Carolina tag LPF9235 in the parking lot of Big Al's Pub, located in the 9200 block of Albemarle Road.

13. In the course of making the stop, Officer Hendricks turned on his vehicle's video recorder, but forgot to turn on his microphone for a period of time.

14. Officer Hendricks observed a large African American male sitting in the driver's seat of

the black Cadillac, and did not observe any passengers in the car.

15. Meanwhile, Detective Suhr stayed in a concealed position to observe the entire traffic stop.

16. Officer Hendricks asked the driver, later identified as Defendant Talvin Leak, for his license and registration. Defendant handed Officer Hendricks a North Carolina driver's license. Officer Hendricks asked the Defendant whether his license was suspended and the Defendant replied "yes."

17. Officer Hendricks asked Defendant to step out of the vehicle, and Defendant did not comply, but instead responded "I'm calling my lawyer." Officer Hendricks asked Defendant two more times to step out of the vehicle, and Defendant then complied.

18. As Defendant stepped out from his vehicle, Officer Decker arrived to assist.

19. Defendant did not appear to be impaired at the time of the stop.

20. Officer Hendricks and Officer Decker were in the process of placing Defendant under arrest for driving with a suspended license when Officer Decker asked Defendant if he had anything on him that the officers needed to know about. Defendant responded that he had a gun concealed in his waistband on his right hand side. As Officer Decker secured Defendant's hands behind his back, Officer Hendricks retrieved a grey Smith & Wesson 9MM gun from Defendant's waistband. Officer Hendricks secured the handgun and placed it on the trunk of the Cadillac. Then, the officers placed handcuffs on Defendant.

21. While the officers continued to search Defendant's person, Officer Decker asked the Defendant if he was a convicted felon and the Defendant replied "yes."

22. At this time, Officer Decker also observed a little bit of a plastic baggie sticking up between the center console and the seat.

23. The officers found no other contraband on Defendant's person other than the concealed weapon.

24. Officer Decker escorted Defendant toward Officer Hendricks' patrol car and then Officer Hendricks took Defendant from there and placed Defendant in the back seat.

25. Afterward, Officer Decker began searching the black Cadillac Defendant was driving.

26. These findings of fact are consistent with the video footage of Defendant's arrest.

27. Based on the review of this video footage, along with the testimony of the officers, the Court finds Defendant not credible in his testimony that Officer Decker arrived after Defendant was secured in the patrol car and that Officer Decker searched the car from the passenger side.

28. When Officer Hendricks placed Defendant in the back of the patrol car, Defendant was under arrest for driving with a revoked license and for possession of a concealed weapon. At this time, Officer Hendricks had not verified whether Defendant was a felon, but noted a potential charge of unlawful possession of a firearm by a convicted felon.

29. Officers Decker and Hendricks were then operating under the assumption that they were able to search the vehicle based on a search incident to arrest. Officer Decker searched the black Cadillac for additional evidence like ammunition, a receipt indicating the ownership of the gun, and other guns. Officer Decker was also looking for drugs based on Detective Suhr's earlier statement that there might be something else in the car, his knowledge that Detective Suhr was part of the narcotics division, and his observation of part of a plastic baggy between the console and the passenger seat when Officer Decker was searching the Defendant.

30. During the search, Officer Decker found approximately 11.1 grams of crack cocaine broken up into about 40 individual rocks inside a baggie between the center console and

the passenger seat. This baggie was found in the same place where Officer Decker had observed earlier a plastic baggie between the center console and the passenger seat while he was searching the Defendant.

31. Officer Decker also observed that the serial number of the gun looked like someone had tried to remove it. Officer Decker ran the serial number and confirmed that the weapon was stolen.

32. Officer Decker contacted Detective Suhr to let him know what he had found.

33. At this point, the officers moved the Cadillac to an adjacent Shell gas station so that it would not block other cars in the parking lot and the door to Big Al's.

34. The officers also made the decision to tow the car because there was no room for the car to be parked; there was no person to pick up the car; the officers were concerned about the car staying in the parking lot and did not want to be responsible for someone breaking into the car; and the officers believed that the vehicle might be subject to seizure based on the drugs found in the car under North Carolina law regarding the controlled substance tax.

35. The black Cadillac driven by Defendant was readily mobile.

36. Officer Decker initiated the towing of the vehicle by calling Southern Star, and subsequently conducted an inventory search and filled out a tow sheet on the car. Officer Decker stayed with the vehicle until the tow truck arrived, and provided the wrecker service with a copy of the two reports.

37. Officer Decker was operating under the impression that the vehicle belonged to the Defendant, but it was later learned through the course of legal proceedings that the car belonged to the Defendant's uncle. As a result, Officer Decker never attempted to call Defendant's uncle about the car.

## III. CONCLUSIONS OF LAW

It is well-established that "[s]earches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnote omitted), quoted in Arizona v. Gant, 129 S. Ct. 1710, 1716 (2009).

Here, Defendant contends that the officers had no lawful basis to conduct a search of the Defendant's vehicle subsequent to his arrest, and therefore, the evidence found inside the vehicle must be suppressed. Defendant relies, in part, on Gant to support this position.[1] At the time this search was conducted in October 2008, Officer Decker and Officer Hendricks were operating in a world pre-Gant and, based on their training and the current state of the law, rightfully believed they were allowed to search the vehicle incident to the arrest. This Court must now determine what impact the decision in Gant has on this search and whether any other warrant exception applies.

**A.     Search-Incident-To-Arrest Exception Based on Gant**

In Gant, the Supreme Court addressed and clarified the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement, as defined in Chimel v. California, 395 U.S. 752 (1969), and as applied to vehicle searches in New York v. Belton, 453 U.S. 454 (1981). The Court held that "[p]olice may search a vehicle incident to a recent occupant's arrest" only in two circumstances: 1) "if the arrestee is within reaching distance of the passenger compartment at the time of the search;" or 2) "it is reasonable to believe the vehicle contains

---

[1]The Defendant included in his supplemental memorandum of law in support of the motion to suppress evidence (Doc. No. 17) an argument that Defendant has standing to claim relief even though he did not own the vehicle. The Government does not challenge Defendant's standing based on the evidence. The Court agrees that this is not an issue.

evidence of the offense of arrest." Id. at 1723. The Court further explained that "[w]hen these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." Id. at 1723-24.

The Government admits, and the record shows, that Defendant was not within reaching distance of the passenger compartment at the time of the search. Therefore, the first prong of Gant would not apply here. However, the Government contends that the second part of Gant applies here, which is it was reasonable to believe that the vehicle contains evidence of the offense of the arrest. The Supreme Court did not further define under what circumstances this second part of Gant would apply; however, in a recent opinion, the D.C. Circuit further discussed its meaning. United States v. Vinton, 594 F.3d 14, 25 (D.C. Cir. 2010). In Vinton, the D.C. Circuit recognized that "the 'reasonable to believe' standard requires less than probable cause, because otherwise Gant's evidentiary rationale would merely duplicate the 'automobile exception,' which the [Supreme] Court specifically identified as a distinct exception to the warrant requirement." Id. (citing Gant at 1721). "[T]he officer's assessment of the likelihood that there will be relevant evidence inside the car must be based on more than 'a mere hunch,' but 'falls considerably short of [needing to] satisfy [ ] a preponderance of the evidence standard." Id. (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)).

Defendant attempts to argue that the case before this Court is exactly like Gant in that both were arrested for driving with a suspended license, and there could be no possibility of obtaining further evidence related to that offense. However, the record clearly shows the present case is readily distinguishable from Gant because Defendant was arrested for both driving with a

revoked license and for carrying a concealed weapon prior to the search of the vehicle.[2]  Officer Decker testified that, based on his training, he was also searching the vehicle for evidence relating to the weapon, like ammunition, a receipt indicating the ownership of the gun, and other guns.

Defendant also argues that Vinton is distinguishable from the present case because the weapon, specifically a knife seen in plain view, gave probable cause to search the vehicle. However, this Court rejects Defendant's argument on this point because the D.C. Circuit went to great lengths to explain, as noted above, that a search based on the "reasonable to believe" standard requires less than probable cause.  See Vinton, 594 F.3d at 25.  Defendant also argues that the concealed weapon in this case was located on Defendant's person and not in plain view like in Vinton.  The Court is not persuaded by this argument because the D.C. Circuit makes clear its reasoning was based on a defendant's arrest for unlawful possession of a weapon.  Id. Specifically, the D.C. Circuit noted that:

> [Defendant] was arrested for the unlawful possession of a weapon, an offense that resembles narcotics-possession offense far more closely than it resembles a traffic violation.  Indeed, it is difficult to imagine a principle basis for distinguishing the possession of narcotics from the possession of an unlawful weapon, where an arrest for the former makes it reasonable to believe additional narcotics remain in the car, but an arrest for the latter does not make it reasonable to believe additional weapons are in the car.

Id. at 25-26.  Based on this rationale, the D.C. Circuit ultimately found that the Officer was "reasonable in expecting that there might be additional weapons in the car."  Id. at 27. Accordingly, this Court concludes, because Defendant was arrested for carrying a concealed

---

[2]In a supplement brief to the Court following the suppression hearing, Defendant raises for the first time a Miranda issue and asks the Court to disregard Defendant's statements about his felon status after his weapon was seized because Defendant had not yet been read his Miranda rights.  The Court finds this objection untimely as Defendant did not seek to have this statement suppressed in motion.  Additionally, in the suppression hearing, the Court asked Defendant if he was seeking to have the statement suppressed to which Defendant replied "no."  This aside, the Court relied more on the fact that Defendant was carrying a concealed weapon than his statement about his felon status.

weapon, the officers reasonably believed that the vehicle contained evidence concerning the gun and a search of the vehicle was proper.

**B. Automobile Exception**

Even if the search of the car was not justified based on the "reasonable to believe" standard, though the Court believes it was, the search of the Defendant's car was justified under the automobile exception. The officers had probable cause to believe that the car contained contraband or evidence of a crime and the car was readily mobile.

The automobile exception to the warrant requirement provides that "if a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more." United States v. White, 549 F.3d 946, 949 (4th Cir. 2008) (citing Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam)). Gant even reaffirmed that "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity, [the automobile exception] authorizes a search of any area of the vehicle in which the evidence might be found." Gant, 129 S. Ct. at 1721 (citing United States v. Ross, 456 U.S. 798, 820-21 (1982)); see also United States v. Washington, 2009 WL 2196860, at *2 (4th Cir. July 24, 2009) (unpublished); United States v. Arriaza, 641 F. Supp. 2d 526, 532-33 (E.D. Va. 2009). The Supreme Court in Gant further noted that, as compared to the search-incident-to-arrest exception, the automobile exception "allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader." Gant, 129 S. Ct. at 1721; see also Arriaza, 641 F. Supp. 2d at 533.

Here, it is undisputed that the car was readily mobile. Rather, the Defendant disputes whether there was probable cause. To determine whether probable cause exists, this Court must assess "whether officers had probable cause by examining all of the facts known to the officers leading up to the arrest, and then asking 'whether these historical facts, viewed from the

standpoint of an objectively reasonable police officer,' amount to probable cause." White, 549 F.3d at 950 (citing Ornelas v. United States, 517 U.S. 690, 696 (1996); see also Illinois v. Gates, 462 U.S. 213, 238 (1983) (determination of probable cause is whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place," "given all the circumstances").

Here, the Government asserts that based on the collective knowledge doctrine, the officers had probable cause to search Defendant's vehicle. As recognized by the Fourth Circuit, probable cause may be established through the collective knowledge of the police even when the arresting officer does not have sufficient personal knowledge to independently establish probable cause. United States v. Laughman, 618 F.2d 1067, 1072-73 (4th Cir. 1980); United States v. Joy, 2009 U.S. App. LEXIS 14887, at *10-11 (4th Cir. March 25, 2009) (unpublished). This collective knowledge doctrine arises in two situations: 1) "when one officer with personal knowledge of facts sufficient to establish probable cause orders another officer, who does not have personal knowledge of those facts, to make an arrest;" and 2) "an officer without independent knowledge of facts sufficient to establish probable cause makes an arrest, but the officer has been in communication with a group of officers that collectively has knowledge of facts sufficient to establish probable cause." Joy, 2009 U.S. App. LEXIS 14887, at *10-11. Though facts exist that might support either situation, the Court finds the stronger basis for the application of the collective knowledge doctrine lies within the second instance.

The record indicates that earlier in the evening, Detective Suhr had conveyed to Officer Decker that he might later require the Officer's assistance in investigating a drug complaint. During the course this drug investigation, Detective Suhr encountered an informant who agreed to cooperate. While Detective Suhr listened on speaker phone, the informant contacted a dealer by cell phone and made arrangements to obtain drugs from the dealer at a gas station. Detective

Suhr learned through this conversation that the dealer would be driving a black Cadillac. After a few minutes, Detective Suhr observed a black Cadillac pass him and drive into the gas station's parking lot. Detective Suhr then attempted to verify that the driver of the vehicle was the person the informant had called. At the request of Detective Suhr, the informant then told the dealer to move to a different location off Albermarle Road because he had seen police in the area. After this phone call, Detective Suhr witnessed the black Cadillac leave the gas station and drive in direction of Albermarle Road. These phone calls are corroborated by Defendant's own testimony that he received a call from an individual wanting some drugs.

At this point, Detective Suhr began following the black Cadillac and observed the black Cadillac run a stop sign at the intersection of Pence Road and Harrisburg Road. Detective Suhr informed Officer Decker that he had observed the black Cadillac run a stop sign and indicated that there might be possibly something else in the vehicle. Detective Suhr also testified that he told Officer Decker that if there were any problems, he had additional "PC," but try to reserve it for the confidentiality of the individual in this car. However, Officer Decker testified that he did not recall this particular statement. Officer Decker asked Officer Hendricks to assist with the traffic stop because Officer Decker's vehicle equipment was not working properly. Officer Hendricks was in direct communication with Detective Suhr about his observation of the black Cadillac and initiating the traffic stop. Both officers were also aware of Detective Suhr's position in the Vice Narcotics Division and understood that the Detective was operating undercover. The officers also communicated with Detective Suhr immediately following the search to make him aware they had found crack cocaine in the car.

Based on these facts, it appears that Detective Suhr had personal knowledge sufficient to establish probable cause. The Court is particularly persuaded that probable cause existed based on Detective Suhr's first-hand observations of the conversation between the informant and

dealer that revealed the dealer would be driving a black Cadillac;³ the fact that Detective Suhr witnessed the black Cadillac leave the gas station and drive in direction of Albermarle Road after the informant indicated to move locations; and Defendant in his own testimony corroborated that he received a call from an individual wanting drugs. Based on the totality of the circumstances and from an objective viewpoint, the Court finds there was a fair probability that contraband or evidence of a crime would be found in the black Cadillac based on the facts known to Detective Suhr.

The question remains whether these facts known to Detective Suhr should be imputed to the arresting officers. Defendant contends that the collective knowledge doctrine fails here because Detective Suhr never informed Officer Hendricks or Officer Decker of any potential probable cause.⁴ However, such an argument misinterprets the collective knowledge doctrine. The Fourth Circuit has explicitly recognized that "when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest." Joy, 2009 U.S. App. LEXIS 14887, at *11-12 (citing Laughman, 618 F.2d at 1072 n.3).

---

³Defendant has asserted that the informant here is unreliable and cannot be used to support a finding of probable cause. The Court rejects such an argument because many courts have found probable cause to search after the officer corroborated an informant's tip, even where that informant is unknown, through the officer's personal observation. White, 549 F.3d at 950 (citing Draper v. United States, 358 U.S. 307, 312-13 (1959); United States v. Miller, 925 F.2d 695, 697 (4th Cir. 1991); Gates, 462 U.S. at 698-99). In this case, Detective Suhr personally listened to the informant's conversation that the dealer would be driving a black Cadillac, and observed the black Cadillac in the locations where the drug deal was supposed to take place. Based on Detective Suhr's personal observations, the Court finds these sufficiently corroborate the informant's tip, even though the informant is unknown.

⁴The Court acknowledges that there is some evidence to support the notion that Officer Hendricks and Officer Decker may have had some personal knowledge that could support a finding of probable cause since both were aware of Detective Suhr's position as an undercover narcotics officer, and the fact the Detective Suhr indicated there might be something else in the car. However, given that the collective knowledge doctrine does not necessarily require that the arresting officers to have personally knowledge of the facts establishing probable cause, the Court need not opine further as to what Officer Decker and Officer Hendricks specifically knew since the knowledge of the group is considered collectively to determine whether probable cause existed.

Defendant also questions whether the officers were in "close communication." However, the record shows that Detective Suhr was in direct communication with both officers, and had spoken to the officers multiple times that evening, and even observed the stop and arrest of Defendant from a concealed location. The Court believes this is sufficient to find the Detective and arresting officers were in close communication. Accordingly, the Court finds the collective knowledge among the group was sufficient to establish probable cause, and thus, the search was reasonable based on the automobile exception.[5]

## C. Inventory Search

In light of this Court's conclusions of law that the search was reasonable based on the search-incident-to-arrest exception and the automobile exception, the Court need not opine further on whether the evidence would have been inevitably discovered during an inventory search of the vehicle.

---

[5]Defendant also argues that the facts do not support that plain view was an independent source of probable cause. While the Government does not appear to rely on the plain view doctrine in its argument and does not address the issue in its briefs, the Court agrees with Defendant that the record does not support a search based on plain view.

## IV. CONCLUSION

In sum, the search conducted of the vehicle was permissible pursuant to the "reasonable to believe" standard under the search-incident-to-arrest exception and under the automobile exception based on the collective knowledge doctrine. Accordingly, Defendant's motion to suppress the cocaine found in the vehicle must be DENIED.

IT IS SO ORDERED.

Signed: April 3, 2010

Frank D. Whitney
United States District Judge